```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
IVAN RODRIGUEZ,                                             :
                                                            :    02 Civ. 9597 (WHP) (DF)
                        Petitioner,                         :
                                                            :    **REPORT AND**
        -against-                                           :    **RECOMMENDATION**
                                                            :
PAUL ANNETS, Superintendent of                              :
Wallkill Correctional Facility,                             :
                                                            :
                        Respondent.                         :
------------------------------------------------------------X
```

**TO THE HONORABLE WILLIAM H. PAULEY III, U.S.D.J.:**

## INTRODUCTION

*Pro se* Petitioner Ivan Rodriguez ("Petitioner"), seeking a writ of habeas corpus under 28 U.S.C. § 2254, challenges his 1999 conviction in New York State Supreme Court, New York County. Upon a jury verdict, Petitioner was found guilty of Criminal Sale of a Controlled Substance in the Third Degree and was sentenced as a second felony offender for an indeterminate prison term of four and one-half to nine years. Petitioner is currently incarcerated in the George Motchan Detention Center on Rikers Island.[1]

Petitioner asserts that he was denied his right to a fair trial because the trial court (1) failed to exercise its discretion in considering the jury's request to re-hear his attorney's summation, and (2) allowed certain trial testimony to be read back to the jury when

---

[1] Although Petitioner served a portion of his sentence for the 1999 criminal sale conviction at the Wallkill Correctional Facility, the Court independently learned that he was released on parole on June 28, 2004. While on parole, however, Petitioner was re-arrested for an unrelated crime in December 2005, and, as a result, is currently incarcerated on Rikers Island.

Petitioner was not present in the courtroom. Respondent argues that Petitioner's claims are without merit.

On January 8, 2003, this matter was referred to me for a report and recommendation. For the reasons set forth below, I recommend that the petition for a writ of habeas corpus ("Petition") be dismissed.

## FACTUAL BACKGROUND

On August 20, 1998, New York City Police Department Undercover Officer No. 8819 ("UC 8819") and another undercover officer, No. 19081 ("UC 19081"), went to the vicinity of 139th Street and Broadway in Manhattan to conduct a "buy and bust" operation. (*See* March 24, 1999 Trial Transcript ("3/24/99 Tr.") at 7-15, 42-45, 141-44.) Sometime after 11:00 p.m., UC 8819 left the vehicle in which he and UC 19081 had arrived, and approached a grocery store on 139th Street and Broadway. (*Id.* at 12-16.) As he walked towards the grocery store, UC 8819 was approached by an individual he later identified as Petitioner, who asked UC 8819 what he was looking for. (*Id.* at 16-17.) UC 8819 responded that he was looking for "cook-up," a street name for crack cocaine. (*Id.*) Petitioner asked UC 8819 how much he wanted, and UC 8819 replied that he was looking for four grams. (*Id.* at 17.) Upon Petitioner's instruction, UC 8819 followed him into the grocery store. (*Id.*)

Once inside the store, Petitioner removed a calculator from his pocket and calculated a price of $100 for the four grams of crack cocaine. (*Id.* at 17-19.) Petitioner then left the store and, upon his return, frisked UC 8819 and questioned whether UC 8819 was a police officer. (*Id.* at 19-20.) Petitioner left the store again and returned with two other individuals, who were later identified as David Beltre ("Beltre") and Newton Rodriguez ("N. Rodriguez"), two of

2

Petitioner's co-defendants at trial. (*Id.* at 20-23.) After beginning to frisk UC 8819 again, the three men left and, a few minutes later, returned to the store with another individual, Juan Alberto Reyes ("Reyes"), another of Petitioner's co-defendants at trial. (*Id.* at 33-34.) Reyes shook UC 8819's hand, and in doing so, passed a clear plastic bag containing cocaine[2] to UC 8819. (*Id.* at 37.) UC 8819 looked at it, placed it in his pocket, and, upon Petitioner's request for money, gave Petitioner $100 in "pre-recorded buy money." (*Id.* at 37, 51.) The transaction in the grocery store took approximately 15 minutes. (*Id.* at 41.)

UC 8819 then began walking back to the vehicle in which UC 19081 remained, and, using a one-way radio, notified Sergeant Maria Brogli ("Sergeant Brogli") and Detective John Gonzalez ("Detective Gonzalez"), who were in a car nearby, that a "positive buy" had occurred. (*See id.* at 51-52; *see also* 3/25/99 Tr. at 297-303, 402-03.) UC 8819 then gave Sergeant Brogli and Detective Gonzalez information about the number of people involved in the sale and their physical descriptions, as well as their location in front of the grocery store, and subsequently repeated the information to the entire "field team," *i.e.*, other officers in the area, over a two-way radio. (*See* 3/24/99 Tr. at 113; *see also* 3/25/99 Tr. at 300-03, 402-04.)

At approximately 11:30 p.m., Sergeant Brogli directed other members of the field team to go to the grocery store. (3/25/99 Tr. at 304-06, 404.) As Sergeant Brogli and Detective Gonzalez arrived at the store in their vehicle, they observed four males, who matched the descriptions given by UC 8819, standing in front of the store. (*Id.* at 306, 405.) No one else besides these four men were in the immediate vicinity of the grocery store. (*Id.* at 314, 329-30,

---

[2] The parties stipulated at trial that the substance in the bag was cocaine. (*See* 3/26/99 Tr. at 579-81.)

3

412.) Detective Gonzalez observed the men look towards the unmarked police vehicle, after which three of them began walking away from the store. (*Id.* at 306, 406-11.) Detective Gonzalez then observed that two of the men, Reyes and Beltre, began walking "fast," and that Beltre "threw what appeared to be money . . . over [a] fence." (*Id.* at 414.) Detective Gonzalez asked another member of the field team to hold Reyes and Beltre, after which he jumped over the fence and retrieved the money that had been thrown over. (*Id.* at 415.) Detective Gonzalez recovered $15, of which $10 was pre-recorded buy money. (*Id.* at 514-15.)

Officer John Montes ("Officer Montes") arrived at the scene at about the same time as other members of the field team and observed an individual, who he later identified as Petitioner, walking in an easterly direction away from the store. (*Id.* at 373.) Sergeant Brogli and Officer Montes both observed that Petitioner was wearing a white hat, white shirt, and blue jeans with a raccoon tail hanging out of the back pocket, and that these items matched one of the descriptions given by UC 8819. (*Id.* at 308, 373, 382-83.) Officer Montes followed Petitioner, observed him take off his hat and throw it to the ground, and then apprehended Petitioner; later, Officer Montes retrieved the white hat. (*Id.* at 373-75.) Meanwhile, Sergeant Brogli apprehended N. Rodriguez, while, at the same time, Detective Gonzalez followed and eventually apprehended Reyes and Beltre. (*Id.* at 310, 414-15.)

Without handcuffing the four men, the officers lined them up, facing the street, in front of a nearby store with good lighting. (*Id.* at 416-17.) Sergeant Brogli then contacted UC 8819 and UC 19081, who returned to the area in their car. (*Id.* at 417; *see also* 4/24/99 Tr. at 53-57.) While sitting in the vehicle, UC 8819 identified the four men as those involved in the narcotics sale. (4/24/99 Tr. at 54-57.) Detective Gonzalez then arrested and frisked the men. (4/25/99 Tr.

4

at 418.) From Petitioner, Detective Gonzalez recovered $29, of which $20 was pre-recorded buy money, as well as keys with a "little furry tail," a wallet, a beeper, and a calculator. (*Id.* at 418-21.)

Following their arrest, Petitioner, Reyes, Beltre and N. Rodriguez were each charged with one count of Criminal Sale of a Controlled Substance in the Third Degree. (*See* 3/29/99 Tr. at 791.)

## PROCEDURAL HISTORY

### A. Trial

After pre-trial hearings, which are not at issue here, Petitioner and his three co-defendants proceeded to a jury trial on March 22, 1999, before New York Supreme Court Justice Laura Visitacion-Lewis. At trial, the government's witnesses included UC 8819, Sergeant Brogli, Detective Gonzalez, and Officer Montes. Although N. Rodriguez testified on his own behalf, neither Petitioner nor his remaining co-defendants testified, and the defense did not call any other witnesses. (*See* 3/26/99 Tr. at 582.)

After the parties rested, summations were conducted and completed. On March 29, 1999, the court charged the jury, and the jury began deliberating. During deliberations, the jury requested that the court allow the closing statements of Petitioner's counsel to be read back. (*See* 3/29/99 Tr. at 811.) The court, however, instructed the jury that "the summations of the attorneys are not evidence in the case, and for that reason, I cannot have [the defense summation] read back to you." (*Id.* at 813.) Nonetheless, the court informed the jury that if it wished to re-hear testimony as to any specific fact in evidence, it could properly request a "read back of any

5

of the witness's testimony that might touch on a particular area that [the jury was] exploring."
(*Id.*) The court then sent the jury back to deliberations at 12:52 p.m. (*Id.* at 814.)

Following a lunch recess, the jury requested a read back of the "cross-examination of Detective Gonzalez about recovering money thrown over the fence," as well as a read back of the "description of all defendants" that Sergeant Brogli testified to hearing over the radio. (*Id.* at 816-17.)[3] In preparing to have the relevant testimony read back, the court became aware that Reyes had not returned from the lunch recess, and suspected that Reyes had absconded. (*See id.* at 817-18.) The court, concerned that the jury might speculate as to Reyes' absence if they were brought in to re-hear the requested testimony, discussed with the attorneys the possibility of conducting the read-backs outside the presence of all of the defendants. (*Id.* at 821.) The record reflects the following agreement:

>THE COURT: The defense attorneys have been consulting. Nobody wants to keep the jurors waiting any longer for the read back requested. And, as I understand it, an agreement has been reached among the attorneys that what we'll do is we'll have the jurors come in, and it will be no defendants present. And each of the defendants who are here,

---

[3] After searching through the transcripts in preparation for the read back, the court noted outside the jury's presence that "while there is no description by Sergeant Brogri [*sic*], there is a portion of her testimony, in which she states the type of thing given in the transmission, such as the gender, and number of persons, and quoting descriptions . . . generally, without specifying what they are." (3/29/99 Tr. at 818.) This portion of Sergeant Brogli's testimony was read back to the jury. (*See id.* at 823-24.) The jury, who appeared to be under the mistaken belief that Sergeant Brogli had given testimony on specific descriptions of the defendants, sent a "follow-up" note and requested to re-hear the cross-examination of Sergeant Brogli "of any descriptions that she heard of the suspect" over the radio. (*Id.* at 825.) After the court and the parties' attorneys examined the transcripts, they agreed that Sergeant Brogli did not testify as to the specific descriptions she heard over the radio from UC 8819, and the court thus informed the jury that there was no evidence of specific descriptions that Sergeant Brogli heard over the radio. (*Id.* at 825-26.)

6

> that is to say [Petitioner], Mr. Newton Rodriguez, and
> Mr. David Beltre has been spoken to by his attorney.
> And each defendant agrees to waive his appearance
> for the purpose of these read backs in order that we not
> continue to delay the jury, and that we have a little time
> to ascertain where Mr. Juan Alberto Reyes is.
> Is that correct?
>
> MR. MANIATIS [Petitioner's Counsel]: Yes.
>
> MR. HEILBRUN [N. Rodriguez's Counsel]: Yes.
>
> MR. MANIATIS: Yes, I've explained to [Petitioner].
>
> MR. ALBERT [Beltre's Counsel]: Yes.
>
> THE COURT: So, we'll do that.

(*Id.* at 821.) The court then issued a bench warrant for Reyes, asked the defendants to leave the courtroom, and stated: "The record should reflect that the three co-defendants are now out of the courtroom." (*Id.*) The court then called the jury back into the courtroom and read back the requested testimony. (*Id.* at 823-24.)

Later that afternoon, the jury convicted Petitioner and Reyes on one count each of Criminal Sale of a Controlled Substance in the Third Degree, but acquitted Beltre and N. Rodriguez of the charges. (*Id.* at 827-32.) On April 14, 1999, Petitioner was sentenced as a second felony offender to an indeterminate imprisonment term of four and one-half to nine years. (*See* 4/4/99 Tr. at 9.)

### 2. **Direct Appeal**

On August 30, 2001, Petitioner appealed his conviction to the Appellate Division, First Department on the grounds that (1) the trial court's refusal to exercise its discretion to allow the jury to re-hear the summation of Petitioner's counsel deprived Petitioner of his right to a fair

7

trial, and (2) Petitioner's right to be present at trial was violated when, during jury deliberations, the trial court responded to substantive jury questions outside Petitioner's presence. (*See* Declaration of Jennifer K. Danburg in Opposition to Petition for Writ of Habeas Corpus, filed on Apr. 15, 2003 ("Danburg Decl.") (Dkt. 8), at Ex. A.)

On December 11, 2001, the Appellate Division unanimously affirmed Petitioner's conviction. (*See* Danburg Decl. at Ex. C.) Citing *People v. Velasco*, 77 N.Y.2d 469, 474 (1991), the Appellate Division held that the trial court had "erred in refusing the jury's request for a read-back of [Petitioner's counsel's] summation," but nevertheless found that the Petitioner was "not seriously prejudiced by the court's response to the jury's request." (*Id.*, Ex. C at 19.) Additionally, the court concluded that the Petitioner "knowingly and intelligently waived his right to be present during a read-back of testimony" after conferring with his trial counsel. (*See id*. at 19-20 (citing *People v. Parker*, 57 N.Y.2d 136 (1982).)

Petitioner requested leave to appeal to the New York Court of Appeals in letters dated January 10, 2002 and February 4, 2002, raising both of the claims he raised before the Appellate Division. (*See* Danburg Decl. at Ex. D.) Petitioner's application for leave to appeal was denied on March 27, 2002. (*See id.* at Ex. F.)

### 3. Habeas Petition

On October 10, 2002,[4] Petitioner timely filed the Petition (*see* Dkt. 2), which raises the same two grounds raised by Petitioner on appeal. (*See* Petition at 5.) On April 15, 2003, Respondent filed a Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Resp. Mem.") (Dkt. 7), together with the Danburg Declaration, which attached exhibits in support of Respondent's opposition. Petitioner has not filed any reply to Respondent's opposition papers.

## DISCUSSION

## I. EXHAUSTION

A federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct' alleged violations of . . . prisoners' federal rights." *Picard*, 404 U.S. at 275 (quoting *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)). Once the state courts are apprised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those

---

[4] Although the Court's docket reflects a filing date of December 3, 2002 (*see* Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court. *See Houston v. Lack*, 487 U.S. 266, 270 (1988). Thus, in the absence of evidence to the contrary, the Court will deem the Petition to have been filed on October 10, 2002, the date Petitioner signed it. *See, e.g.*, *Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).

In this case, Petitioner raised on direct appeal the same claims he now raises in the Petition, and when the Appellate Division affirmed his conviction, Petitioner raised the same claims in his application for leave to appeal to the New York Court of Appeals. (*See* Petition at 5; *see also* Danburg Decl. at Exs. A, D, and E.) Further, Petitioner framed his claims before the state courts in a manner that called to mind his federal constitutional rights. (*See, e.g.,* Danburg Decl., Ex. A, at 20.) Accordingly, as Respondent correctly concedes, Petitioner's claims are exhausted and are properly before this Court. (*See* Resp. Mem. at 11.)

## II.  STANDARD OF REVIEW

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

10

28 U.S.C. § 2254(d). Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 73-76 (2003). "[T]he state court's decision must have been more than incorrect or erroneous" – rather, "the state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).

Here, as both of Petitioner's claims were adjudicated on the merits by the state court, this Court must review them under the deferential standard of review set forth in AEDPA.

### III. PETITIONER'S CLAIMS

#### A. The Trial Court's Refusal To Allow the Jury To Re-hear the Summation of Petitioner's Counsel

Petitioner first claims, as he did in state court, that the trial court's failure to engage in any discretionary analysis when the jury asked to re-hear the summation of Petitioner's counsel constituted a statutory violation and deprived him of his right to a fair trial. (*See* Petition at 5; *see also* Danburg Decl., Ex. A at 20.)[5] Although the Appellate Division agreed with Petitioner's

---

    [5] In apprising the state court of the constitutional nature of his claim, Petitioner specifically argued in his appellate brief that the trial court's statutory violation infringed upon his "right to counsel and his right to due process of law," and, in his analysis of those constitutional claims, Petitioner cited Supreme Court case law. (*See* Danburg Decl., Ex. A at 20,

11

contention that the trial court had statutorily "erred in refusing the jury's request for a readback of defense counsel's summation," the Appellate Division nonetheless held that Petitioner "was not seriously prejudiced by the court's response to the jury's request," and rejected his claim. (*See* Danburg Decl., Ex. C at 19.) Because, as discussed below, the Appellate Division's conclusion was neither "contrary to" nor an "unreasonable application of" clearly established federal law, Petitioner's first claim should be dismissed.

When presented with a federal habeas petition that alleges an erroneous ruling by the trial court, this Court's review is "limited to determining whether the alleged error rose to the level of a constitutional violation." *Copes v. Schriver*, No. 97 Civ. 2284 (JGK), 1997 U.S. Dist. LEXIS 16349, at *8 (S.D.N.Y. Oct. 22, 1997); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). Thus, to succeed on his habeas claim, Petitioner must establish that the trial court's ruling regarding summations "was error that infected the entire trial such that his conviction violates due process." *See Gonzalez v. Walker*, No. 99 Civ. 9732 (KMW) (KNF), 2001 U.S. Dist. LEXIS 10844, at *17 (S.D.N.Y. July 31, 2001) (habeas relief denied where petitioner failed to show how the trial court's refusal to instruct the jury on the issue of consciousness of guilt had a "substantial and injurious effect or

---

24-25, 30); *cf. Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) (holding that, absent analysis under federal law, a mere statement in appellate brief that "due process" rights have been violated does not necessarily give rise to a specific federal constitutional claim). In contrast, the Petition – which contains no legal analysis and to which Petitioner did not attach his appellate brief – only generally states that the trial court's error "violat[e]d the right to [a] fair trial." (Petition at 5.) Although the "right to a fair trial" is "implicit in the concept of due process" (*see Gravel v. United States*, 408 U.S. 606, 646 (1972)), the Petition, even when liberally construed, does not charge a violation of Petitioner's right to counsel. As that issue is not mentioned in the Petition, it need not be addressed by this Court.

12

influence in determining the jury's verdict") (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993)), *adopted by Gonzalez v. Walker*, No 99 Civ. 9372 (S.D.N.Y. Dec. 14, 2001).

As a threshold matter, the Court notes that a party's summation does not constitute evidence, as Respondent correctly asserts. (*See* Resp. Mem. at 18); *see also United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994). Rather, "[i]ts purpose is to explain to the jury how that party views the evidence the jury has seen and heard and to suggest to that body what significance or inference it should attach to or draw from the evidence under the relevant law charged by the trial court." *Id.* Thus, although a trial court has broad discretion in deciding whether to grant "a jury's request to hear a summation or a portion thereof read back," such discretion "should be exercised sparingly." *Id.*; *accord United States v. Damsky*, 740 F.2d 134, 138 (2d Cir.) ("Whether to allow testimony to be read back to the jury is within the trial court's sound discretion"), *cert. denied*, 469 U.S. 918, 83 L. Ed. 2d 233, 105 S. Ct. 298 (1984).

Based on the case law cited in its opinion, the Appellate Division appears to have only found error in the trial court's assumption that it did not have discretion to allow summations to be read back. (*See* Danburg Decl., Ex. C at 19 (citing *Velasco*, 77 N.Y.2d at 474).)[6] There is no suggestion by the Appellate Division, however, that it would have been error or an abuse of discretion for the trial court to prohibit the requested summation from being read back, had it

---

[6] In *Velasco*, the New York Court of Appeals held that "[w]hether the summations should have been read to the jury under the circumstances of this case was a matter within the trial court's discretion," and concluded that the trial court's refusal to allow summations to be read back was *not erroneous* and was a proper exercise of the court's discretion. *See Velasco*, 77 N.Y.2d at 474. Thus, as Respondent correctly argues, the Appellate Division did not find that the trial court erred by virtue of an abuse of discretion, but rather, erred in its belief that it lacked discretion on this issue. (*See* Resp. Mem. at 15.)

13

done so as a matter of its broad discretion. Significantly, as Respondent correctly notes, courts in the Second Circuit have routinely upheld a trial court's discretionary refusal to have summations read back. (*See* Resp. Mem. at 16, n. 6 (citing cases).) Moreover, the record here demonstrates that the trial court correctly informed the jury that "the summations of the attorneys are not evidence in the case"; that, although the court erroneously believed as a result that the jury was not allowed to hear the summation of Petitioner's counsel again, the court nonetheless instructed the jury that it could ask to re-hear any witness's testimony that it felt was relevant to any specific fact in evidence; and that, upon the jury's request to re-hear specific portions of testimony from Detective Gonzalez and Sergeant Brogli, the court accommodated the jury's request and allowed such testimony to be read back to the jury to the extent such testimony existed. (*See* 3/29/99 Tr. at 813-26.) Given that the trial court did not impede the jury from making such requests or from revisiting any of the actual evidence which formed the basis for the summations – and given that the jury had already heard all of the summations once – Petitioner's claim that the trial court's error had a "substantial and injurious effect or influence in determining the jury's verdict" is unavailing.

Petitioner's claim also fails because the evidence presented at Petitioner's trial established his guilt beyond a reasonable doubt, independent of the summations. *See, e.g., Rodriguez v. Herbert*, No. 02 Civ. 895 (JG), 2004 U.S. Dist. LEXIS 8982, at \*31 (E.D.N.Y. May 20, 2004) (petitioner's habeas claim did not justify issuance of a writ where evidence established "certainty of conviction absent any improprieties in the prosecutor's summation"); *accord Yapor v. Mazzuca*, No. 04 Civ. 7966 (RCC) (AJP), 2005 U.S. Dist. LEXIS 6597, at \*46-47 (S.D.N.Y. Apr. 19, 2005) (noting that test for fundamental fairness is whether excluded

evidence, evaluated in the context of the entire record, created a reasonable doubt regarding petitioner's guilt that did not otherwise exist at trial), *adopted by Yapor v. Mazzuca*, 2005 U.S. Dist. LEXIS 15997 (S.D.N.Y. Aug. 3, 2005). In order to sustain the charge brought against Petitioner – Criminal Sale of a Controlled Substance in the Third Degree – the prosecution was only required to establish, beyond a reasonable doubt, that Petitioner knowingly and unlawfully sold a narcotic drug. *See* N.Y. Penal L. § 220.39(1) (2005). As used in Section 220.30, "sell" is broadly defined to include any transfer of a controlled substance from one person to another, or any offer or agreement to do the same. *See id.* § 220.00(1).[7] Here, the evidence establishes that Petitioner approached UC 8819 and asked him what he was looking for; that, upon UC 8819's response that he was looking for "cook-up," Petitioner and UC 8819 then agreed upon a quantity and price for the sale of cocaine; that Petitioner brought Reyes to UC 8819 in the grocery store; that Reyes then transferred cocaine to UC 8819; that Petitioner requested and accepted $100 in cash from UC 8819 in exchange for the cocaine; and that pre-recorded buy money was found on Petitioner's person following his arrest. Moreover, the evidence established that Petitioner was identified as one of the participants in the drug transaction at the grocery store by UC 8819, who

---

[7] Alternatively, Respondent asserts that Petitioner was charged with the Criminal Sale of a Controlled Substance in the Third Degree under a theory of accomplice liability, requiring the prosecution to establish, beyond a reasonable doubt, that Petitioner "act[ed] with the mental culpability required for the commission" of the sale offense, and that he "solicit[e]d . . . or intentionally aid[ed]" another person to engage in the knowing and unlawful sale of a narcotic drug. (*See* Danburg Decl., Ex. B at 14-15) (citing 3/29/99 Tr. at 792-94 and N.Y. Penal Law §§ 20.00, 220.39(1)).) Although it is not clear whether the trial court considered N.Y. Penal Law Section 220.00(1) (defining "sell" to include offer or agreement to transfer a controlled substance), Section 20.00 (governing general accomplice liability), or both sections in delivering its charge to convict Petitioner of Criminal Sale of a Controlled Substance in the Third Degree under Section 220.39(1), the evidence at trial was sufficient to convict Petitioner of the sale offense under either Section 220.00(1) or Section 20.00.

15

closely interacted with and saw Petitioner multiple times in a 15-minute period, and who was able to identify Petitioner again shortly thereafter. In sum, regardless of the arguments made in summation, the jury heard ample evidence placing Petitioner at the scene of the crime and linking him to the sale of cocaine to UC 8819. Accordingly, Petitioner's claim that he was denied a fair trial lacks merit, as "it can fairly be said that his conviction was the result of the jury's assessment of the evidence," and not the result of the trial court's refusal to allow the jury to rehear his attorney's summation. *See Pilgrim v. Keane*, No. 97 Civ. 1516 (SJ), 2004 U.S. Dist. LEXIS 27480, at *7-8 (E.D.N.Y. Aug. 12, 2004) (finding that petitioner had a fair trial and dismissing habeas petition where the jury heard ample evidence placing Petitioner at the scene of the crime and directly linking him to crime charged).

For these reasons, the Appellate Division's finding that Petitioner "was not seriously prejudiced" by the trial court's error is neither "contrary to" nor an "unreasonable application of" clearly established federal law. *See* 28 U.S.C. §2254(d). Thus, under AEDPA, dismissal of Petitioner's first claim is warranted.

### B.  The Read-Back of Trial Testimony Outside Petitioner's Presence

Petitioner also claims that his right to a fair trial was violated when the trial court permitted the jury to re-hear testimony while Petitioner was not in the courtroom. (*See* Petition at 5.) The Appellate Division, however, rejected this claim because it found that, based on the record, Petitioner had "knowingly and intelligently waived his right to be present during a readback of testimony." (*See* Danburg Decl., Ex. C at 19-20.)

A criminal defendant is entitled "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819-20

16

n.15 (1975); *see also Rushen v. Spain*, 464 U.S. 114, 117-18 (1983) (right to personal presence at all critical stages of the trial is a "fundamental right[] of each criminal defendant"). This right is "scarcely less important to the accused than the right of trial itself," *Diaz v. United States*, 223 U.S. 442, 455 (1912), and is rooted in both the Sixth Amendment Confrontation Clause and the Due Process Clause. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985); *see also Illinois v. Allen*, 397 U.S. 337, 338 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial") (citations omitted). Given a criminal defendant's fundamental right to be present at trial, a court cannot conduct a trial *in absentia* "unless the defendant knowingly and voluntarily waives his right to be present, and the public interest in proceeding clearly outweighs the interest of the voluntarily absent defendant in attending his trial." *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir.), *cert. denied*, 528 U.S. 884 (1999) (citations omitted). Only the first element, however – a knowing and voluntary waiver – is required by the Constitution. *Id*. The second element – a balance of interests weighing in favor of proceeding without the defendant – "simply governs the trial court's exercise of its discretion to proceed with a trial *in absentia* that is constitutionally permissible." *Id*. (citations omitted); *see also Taylor v. United States*, 414 U.S. 17 (1973) (discussing knowing and voluntary waiver of right to be present at trial as sufficient for constitutionally valid trial *in absentia*).

Under federal law, a defendant can waive his right to be present at trial expressly or by voluntarily failing to appear. *See, e.g., Taylor*, 414 U.S. at 20; *United States v. Mera*, 921 F.2d 18, 20 (2d Cir. 1990). A knowing and voluntary waiver of the right to be present may also be "implied from the defendant's conduct," *United States v. Nichols*, 56 F.3d 403, 416 (2d Cir.

17

1995) (citations omitted), including a "failure to readily object at the time the decision is made to proceed without the accused." *Clark v. Stinson*, 214 F.3d 315, 3224 (2d Cir. 2000), *cert. denied*, 531 U.S. 1116 (2001) (citation omitted). Moreover, a defendant need not personally waive his right to be present at trial or related proceedings; the waiver may occur through a defendant's counsel. *See Polizzi v. United States*, 926 F.2d 1311, 1322-23 (2d Cir. 1991) (holding that counsel effectively waived defendant's right to be present at trial and noting that, although it is preferable that such a waiver come from a defendant directly, "there is no constitutional requirement to that effect"); *see also United States v. Doe*, 964 F.2d 157, 159 (2d Cir. 1992) (counsel effectively waived defendant's right to be present during court proceeding even when defendant was absent during waiver); *Ellis v. Phillips*, No. 04 Civ. 7988 (SHS) (AJP), 2005 U.S. Dist. LEXIS 13910, at *49-50 (S.D.N.Y. July 13, 2005) (noting that right to be present at trial and related proceedings "may be made by the defendant or by defense counsel"), *adopted by Ellis v. Phillips*, No. 04 Civ. 7988 (SHS) (S.D.N.Y. Aug. 4, 2005).

Here, the record establishes that Petitioner acted through counsel to effectively waive his right to be present during the read backs at issue. First, there can be no question that an agreement was reached among the attorneys and the court that, in an effort to prevent the jury from speculating about Reyes' absence, none of the defendants would be present during the read-backs requested by the jury. (*See* 3/29/99 Tr. at 821.) Moreover, the record clearly reflects that Petitioner, as well as his co-defendants, were spoken to by their respective attorneys, and that Petitioner's counsel confirmed the accuracy of the court's statement that "each defendant agree[d] to waive his appearance for the purpose of these read backs in order that we not continue to delay the jury." (*Id.*) In agreeing with the court's statement that he had obtained

18

Petitioner's consent to be absent during the requested read-backs, Petitioner's counsel also stated that he had "explained" the situation to Petitioner. (*Id.*)

Based on the record presented, the Appellate Division's conclusion that Petitioner "knowingly and intelligently" waived his right to be present while testimony was read back to the jury was neither "contrary to" nor an "unreasonable application of" federal law. *See* 28 U.S.C. §2254(d). Under AEDPA, I therefore recommend that the claim be dismissed for lack of merit.

## CONCLUSION

For the foregoing reasons, I recommend that Petitioner's petition for a writ of habeas corpus be DISMISSED in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley III, United States Courthouse, 500 Pearl Street, Room 2210, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 40 Centre Street, Room 631, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Pauley. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-*

*CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      February 2, 2006

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Honorable William H. Pauley III, U.S.D.J.

Ivan Rodriguez, *pro se*
George Motchan Detention Center (C-73)
Rikers Island
15-15 Hazen Street
East Elmhurst, NY 11370

Jennifer K. Danburg, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, NY 10271